*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re PALLETT/GUNTER/MACGILLIS, Minors.

UNPUBLISHED
January 16, 2020

No. 349042
St. Clair Circuit Court
Family Division
LC No. 18-000413-NA

Before: K. F. KELLY, P.J., and BORRELLO and SERVITTO, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating her parental rights to her minor children, KMP, WEG, and AMM,[1] pursuant to MCL 712A.19b(3)(g) (parent fails to provide proper care or custody) and (j) (reasonable likelihood that children will be harmed if returned to parent). We affirm.

## I. FACTS

St. Clair County Department of Health and Human Services (DHHS) first became involved with respondent's family in October 2015 after AMM was beaten with a broomstick by the wife of his biological father. Respondent was unable to take custody and care for AMM because she was jailed for her third alcohol related driving offense. At that time, KMP and WEG went to live with their biological fathers. However, upon her release from jail in December 2015, respondent engaged in services, including substance abuse and psychological assessments, counseling, in-home parenting services, drug screens, and a family reunification program. AMM was returned to respondent's care in July 2016. At some point in time, KMP and WEG also began to reside with respondent. Despite AMM's return, DHHS continued to monitor the family until the case was closed in February 2017.

---

[1] The father of AMM also had his parental rights terminated, but he is not a party to this appeal. Respondent had a fourth child, HP, but she was placed in a guardianship with nonrelatives and was not included in this petition.

The family moved to Detroit and came to the attention of Wayne County DHHS in September 2017. The family resided in a home that did not have heat, hot water, or working appliances, and the family's food supply was limited. The family had to heat water in a microwave for hot water or shower at a local truck stop. Respondent reportedly moved the family back to St. Clair County to a more supportive environment and because she recognized the deficient home conditions. St. Clair County DHHS received notice of the transfer and contacted respondent in November 2017. Respondent declined the offer for substance abuse screening and services on two occasions. She explained that she had just completed her foster care case and "wasn't going through this again" and expressed that the only substance she used was marijuana. Respondent and two children, AMM and HP, resided with her uncle in his home, that was determined to be appropriate, and she paid rent. After verifying the wellbeing of the two children, DHHS closed its case on December 20, 2017.

On December 5, 2018, respondent was sentenced to six months in jail for embezzlement. Apparently, respondent and AMM no longer resided with her uncle, but had moved into a trailer park. Although KMP and WEG had lived with their fathers for approximately two years, AMM, then 12-years old, was left at the trailer home alone. AMM messaged WEG that respondent was sent to jail although he was told not to reveal the information. Consequently, WEG went with his father, Eric Gunter, to pick AMM up at 10:00 p.m. AMM allowed them to enter the home. There was a half-gallon of water in the refrigerator and an empty tortilla box in the freezer. Although AMM received a cell phone from WEG, he had to walk down the street to communicate because it only worked with a Wi-Fi connection that was unavailable in the trailer. Thus, respondent went to jail without providing AMM with a means to contact others from the home. AMM's clothes were dirty. There were approximately 20 needles or caps on the couch, and an estimated 200 needles or caps in the home as well as drug paraphernalia, including burnt spoons and butane torches. Gunter described the home as an unlivable drug house. He advised AMM to pack his stuff to leave because there was no heat, food, or water. AMM was hungry, and they provided him with food. Although Gunter presumed that he would bring AMM to his home, the children decided that AMM would stay with KMP's father.

Gunter testified that his relationship with respondent ended when WEG was five months old, and WEG was now 15-years old. During their relationship, respondent only smoked marijuana. Gunter opined that she now injected drugs as evidenced by needle marks on her arm that she tried to hide and from information provided by an ex-boyfriend of respondent. Additionally, respondent was not interested in parenting the children, but acted as a friend. The older children, KMP and HP, raised the younger boys, WEG and AMM, and got them ready for school. Because the children were not attending school when they resided in Detroit, Gunter called DHHS, and that caused respondent to move from Wayne County. WEG was active in three sports at his current school, but respondent did not encourage school or extra-curricular activities. WEG had a cell phone and was able to maintain contact with respondent. However, she had not seen WEG for fifteen months, but saw him two weeks before she went to jail.

KMP resided with her father, Brett Pallett, since 2017. She requested to remain with Pallett after spending the summer with him. Respondent agreed to the custody change because she could not provide a stable home. KMP moved from school to school in respondent's care. Although KMP had a cell phone, respondent did not have extensive contact with her and did not provide financial support, gifts, or cards. KMP was home schooled through an online program

and a member of the honor society. Respondent represented to Pallett that she would keep HP, also Pallett's daughter, but ultimately placed her in a guardianship.

A child protective services (CPS) worker learned that respondent was jailed on December 5, 2018, AMM was left without proper care and custody, there were drugs in the home, and AMM was not receiving a formal education. The worker met with respondent in jail on December 13, 2018. Respondent asserted that she was unaware that she would be jailed; rather, she believed that she would only be sentenced to fines and costs. With regard to the allegations about the condition of the home and drug use, respondent represented that she was falsely accused by Gunter, investigations did not substantiate the allegations, and any drug paraphernalia belonged to her ex-husband. She admitted to alcohol and marijuana use, but denied "hard" drug use. She admitted to being a victim of domestic violence in the past and to having mental health issues. Respondent reported that she had not seen KMP for a significant amount of time. She acknowledged that AMM was not attending online school, but attributed it to an issue with Wi-Fi in the trailer park. Further, AMM's medical insurance lapsed because respondent failed to submit the forms. When advised that a petition would be filed, respondent indicated that a power of attorney would be sufficient. Because it was concluded that the children would be harmed in respondent's care and custody, the worker filed a petition to take jurisdiction and seek termination of her parental rights.

Respondent testified that she would be released from jail on May 15, 2019. Her conviction for embezzlement occurred because money was taken from her while working in pizza delivery, and she failed to call the police. Upon her release, respondent would reside in a modular home that she received in her divorce and would return to a job at a marina. Respondent was sentenced at 1:00 p.m., and did not believe she would receive jail time. She left five phone numbers with AMM for him to call if she went to jail so he would be safe. When she left for court, AMM had a government issued phone with minutes available, there were no drugs or drug paraphernalia in the home, and there was food in the home. Respondent denied using "hard" drugs and divorced her husband because of his drug use. KMP, HP, and WEG resided with respondent until she moved back to St. Clair County in 2017. Respondent testified that she participated in services and no longer had a problem with alcohol use. She admitted to allowing KMP and WEG to live with their fathers because she was unable to care for all four children. Respondent testified that she did need help and denied declining services. Following this evidence, the trial court assumed jurisdiction over the children, concluding that respondent's testimony was "completely incredible."

A dispositional and best interest hearing was held. Gunter opined that it was in the best interests of all the children to have respondent's parental rights terminated. With regard to WEG, he testified that while in respondent's care, the child was "always missing school," "getting into trouble," and "had an attitude." The children were left home alone and did not have guidance or supervision. Following visits with respondent, WEG would act out and get in trouble at school or have an "attitude." When the behavioral issues were raised with respondent, she acted "like it was no big deal," and she refused to accept suggestions. Although respondent received services from DHHS, Gunter did not notice any change in respondent. The children were having a stable life without respondent's involvement. AMM visited the Gunter family nearly every weekend, and he was now a happy child that attended school; previously he appeared depressed and timid. Gunter testified that he obtained full custody of WEG when

respondent failed to appear in court because she was trying to avoid a CPS investigation. He allowed WEG to have a relationship with respondent, but he concluded that it was not in WEG's best interest because she did not follow through and "show up." For example, respondent was invited to watch WEG's sporting events, but she only appeared for one. WEG was extremely disappointed and no longer wanted anything to do with respondent. Further, when the children lived with respondent, the older children, KMP and HP, raised WEG and AMM by getting them dressed and ready for school. When Gunter went to pick up AMM, the home looked like a party house, the oven door was open to heat the place, and there was no food in the house.

Similarly, Pallett, KMP's father, opined that termination of respondent's parental rights should have happened years ago. He noted that KMP and HP were removed and placed in a guardianship with his sister before he was permitted to have custody. Pallett testified that when the children failed in school, respondent told educators that homework was the children's problem, not hers. Respondent had not seen KMP in over two years. There was a plan for respondent to take KMP to lunch, but they never heard from her. KMP acted like a parent as opposed to a child because she cared for her younger siblings. Pallett discussed issues with respondent, but she did not change. He opined that additional services would not improve respondent's ability to parent. Further, it was difficult to keep in contact with respondent because her phone number and residence kept changing. Additionally, respondent did not want to parent her children, but sought to befriend them. Ultimately, respondent consented to allow KMP to live with Pallett because she could not handle the responsibility of four children. Although Pallett would allow respondent to have parenting time, she did not request it. KMP indicated that she did not care if she had a relationship with respondent and never requested to live part-time with respondent.

KMP, then 17-years old, testified that she lived with her grandmother, Pallett, his wife, and two stepsisters. When KMP lived with respondent, they moved approximately every six months. Respondent left the home constantly. Food was "hard to come by some days," and KMP and HP had to try to make food for all the children. KMP and HP took care of WEG and AMM. KMP wanted to believe that respondent could change, but did not think she was capable. Respondent was given plenty of opportunities to change, but had not. KMP was "fine" if respondent's parental rights were terminated. However, she was glad that termination of parental rights was requested because she worried about AMM in respondent's care. KMP and WEG turned to their fathers for stability and support, but AMM did not have a family member that provided stability. KMP estimated that she exchanged text messages with respondent once or twice a month.

The CPS worker sought termination of respondent's parental rights. The worker opined that KMP had been subjected to ongoing neglect throughout her life. Respondent moved the family to different homes, subjected them to her substance abuse, and left them while jailed. KMP was not provided sufficient food and had to act as a parent to her siblings. Although KMP was placed with Pallett, respondent failed to maintain contact and failed to provide emotional, physical, and financial support. KMP expressed that she felt better without respondent, and respondent did not provide motherly advice, but tried to act as a friend. The worker acknowledged that KMP would turn 18-years old shortly, but nonetheless sought termination of parental rights because KMP wanted a sense of closure. Similarly, the worker testified that termination of respondent's parental rights was in WEG's best interests. WEG needed the

-4-

stability of knowing where he would sleep each night, that a hot meal would be available, and that he would attend school. WEG currently lived with Gunter and his grandmother. WEG was "absolutely done" with respondent, and the bond between them was broken. WEG saw respondent at the last court hearing, and it was detrimental because it caused him issues at school. Finally, the worker opined that it was imperative to terminate respondent's parental rights to AMM. AMM was placed with his father because of respondent's incarceration, but he was beaten by his stepmother. Yet, in respondent's care, he was moved to different homes and did not attend school for two years. Respondent left him alone when she was sentenced to six months in jail. Termination of respondent's parental rights would allow AMM to have long-term stability, resources, and services necessary to become a functional adult. Although respondent engaged in services for a prior removal of the children, she did not demonstrate a benefit from services because she moved into another deplorable home. The worker opined that providing additional services to respondent would merely prolong the situation and subject AMM to additional trauma. In 2017, CPS offered to provide additional services to respondent, but she refused. Although respondent denied being offered further resources, the records contradicted her claim. The worker acknowledged that she did not personally visit respondent's residence because she was in jail. Respondent opted not to testify at this hearing.

The trial court found that the statutory grounds were established where respondent moved from home to home, lived in places without heat, did not provide adequate food for the children, and did not ensure that the children attended school. The court acknowledged that respondent participated in and completed services, but she failed to benefit as evidenced by her return to deplorable housing conditions. Furthermore, respondent left AMM alone when she went to jail and failed to make arrangements for him or even give him the means to communicate for help. Although respondent denied refusing assistance and drug use, the trial court found that her testimony was not believable and her drug use posed a risk of harm to AMM. The trial court further examined the individual circumstances of KMP, WEG, and AMM, and nonetheless, concluded that termination of respondent's parental rights was in the children's best interests. From this decision, respondent appeals.

## II. APPLICABLE LAW

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). "We review for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence." *Id*.; see also MCR 3.977(K). Once a statutory ground for termination has been established, the trial court must conclude that termination of parental rights is in the child's best interests before it can terminate parental rights. MCL 712A.19b(5); *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A trial court's decision regarding a child's best interests is also reviewed for clear error. *In re Laster*, 303 Mich App 485, 496; 845 NW2d 540 (2013). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 491.

## III. STATUTORY GROUNDS

Respondent contends that petitioner failed to prove the statutory grounds for termination by clear and convincing evidence when she fully cooperated with the services in a previously opened case, she would be released from jail shortly, and the worker never inspected the home. We disagree.

The court found that the following provisions of MCL 712A.19b supported termination of respondent's parental rights:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

We conclude that there was clear and convincing evidence to support the statutory grounds for termination. DHHS has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights, and those efforts include creation of a service plan with the steps that the parent must take to rectify the issues that led to court involvement and to permit reunification. *In re Hicks*, 500 Mich 79, 85-86; 893 NW2d 637 (2017). DHHS must also provide services to facilitate the child's reunification. *In re Mason*, 486 Mich 142, 156-159; 782 NW2d 747 (2010). "While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242 248; 824 NW2d 569 (2012). However, a parent must not only participate in services, she must demonstrate a benefit from the services. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). DHHS is not required to provide reunification services when termination of parental rights is the agency's goal. *In re HRC*, 286 Mich App 444, 463; 781 NW2d 105 (2009).

Respondent failed to provide proper care or custody for the children, although financially able, and there was no reasonable expectation that she would be able to provide proper care and custody within a reasonable time in light of the children's ages. In this case, the children reported that they moved from house to house every six months. There was a lack of food in the home. Respondent left the children unsupervised, and KMP and HP began to ensure that WEG and AMM were dressed and ready for school and fed. Respondent admitted to domestic violence, alcohol and marijuana use, and mental health issues. She was jailed for her third alcohol related driving offense when AMM was severely beaten by his stepmother. Because of

-6-

her incarceration, respondent was unable to provide care and custody for AMM. To her credit, respondent engaged in and completed services that allowed AMM to be returned to her home. However, respondent did not benefit from services because she moved to Wayne County to a home that did not have heat, hot water, or working appliances. Gunter called CPS when he learned that the children were not attending school. Respondent returned to St. Clair County with AMM to live with her uncle. She refused additional services, and her case was closed. Approximately one year later, respondent was jailed again for embezzlement and left AMM home alone. AMM was able to communicate with WEG. This prompted WEG and his father, Gunter, to pick AMM up from a home Gunter characterized as an unlivable drug house. Gunter testified that all of AMM's clothes were dirty, and there was no food or heat there.

On the contrary, respondent testified that she was unaware that she would be jailed and claimed that her embezzlement conviction arose from her failure to report to the police money forcibly taken from her during pizza deliveries. She further denied engaging in drug use and attributed any drug paraphernalia in the home to her ex-husband. Respondent asserted that she left AMM with food in the home, a working phone, and contact information for five different people in the event she was jailed. She denied declining any additional services and claimed she would have welcomed the help. However, the trial court found this testimony was unbelievable.

Although respondent would be released from jail soon and the conditions of respondent's home were not photographed, there was sufficient credible testimonial evidence to support the statutory grounds in the record. Respondent did not provide safety and stability for her children, and despite the completion of services, moved her children into a home without heat, hot water, and working appliances. Finally, she exposed AMM to a substantial risk of harm by leaving him unattended in a home without adequate food and heat and with drug paraphernalia strewn about the home. Thus, the statutory grounds were satisfied by clear and convincing evidence.

## IV. BEST INTERESTS

Respondent contends that petitioner failed to prove by a preponderance of the evidence that termination was in the children's best interests because AMM was only in placement for a short period of time and KMP and WEG remained with their fathers. We disagree.

"[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. All available evidence should be weighed to determine the child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The best interest determination focuses on the child rather than the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). The factors to consider when determining the child's best interests include the child's bond to the parent, the parent's parenting skills, the child's need for permanency, stability, and finality, the advantages of a foster home over the parent's home, and the child's placement with relatives. *Id*. If the best interests of the individual significantly differ, the trial court should consider each child individually when making the determination regarding best interests. *In re White*, 303 Mich App at 715-716.

We conclude that the trial court did not clearly err in finding that it was in the children's best interests to terminate respondent's parental rights. Respondent had a history with petitioner,

and she was offered and completed services that allowed the children to be returned to her care. However, respondent did not benefit from the services that she completed. Instead, she moved to Wayne County to a home that did not have heat, hot water, or working appliances. Once again, as delineated above, respondent failed to provide basic necessities to her children, but reportedly had money for drugs. Respondent allowed KMP and WEG to move in with their fathers and returned to St. Clair County with AMM. When respondent was sentenced to six months in jail for embezzlement, AMM was left in the trailer home without heat, food, or clean clothes. Additionally, there was drug paraphernalia all over the home.

The trial court analyzed the best interests of each child. Although KMP was now provided a safe and stable environment with Pallett and would soon turn 18-years old, the trial court found that the termination of respondent's parental rights was in her best interests. KMP had assumed an adult role in caring for her siblings. She tried to ensure that they went to school and were fed despite the lack of food. Respondent did not frequently communicate with KMP and did not seem interested in fostering a relationship. Nonetheless, the termination of respondent's parental rights offered KMP closure. Similarly, WEG was provided a safe and stable environment with Gunter. He enjoyed the social and athletic aspect of school by participating in three sports. However, he seemingly sought respondent's approval and notified her of his athletic meets. She attended a minor portion of one event. After contact with respondent, WEG acted out and regressed in his behavior. Thus, it was concluded termination of respondent's parental rights was in WEG's best interests. Finally, although AMM was bonded to respondent, AMM was subject to the greatest risk of harm because he did not have immediate family available when left unsupervised by respondent. Although respondent had received services, she did not benefit and her actions caused AMM to be placed in foster care for the second time. The risk of harm was substantial in light of respondent's substance abuse and the dangerous condition of the home. Further, there was an expression of interest in AMM's adoption by a relative or the foster family that would provide him permanency that his siblings had obtained with their fathers. Accordingly, the trial court found that termination of respondent's parental rights was in his best interests. In light of the record, we cannot conclude that the trial court clearly erred.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello
/s/ Deborah A. Servitto